AMELIA LAHTINEN v. CONTINENTAL BUILDING COMPANY, a Corporation, Appellant.—97 S. W. (2d) 102.

Court en Banc, October 2, 1936.*

*NOTE: Opinion filed at May Term, 1936, July 2, 1936; motion for rehearing filed; motion overruled at September Term, October 2, 1936.

*Ryland, Stinson, Mag & Thompson* and *Robert E. Rosenwald* for appellant.

*Julius Shapiro, Frank Benanti, William Goodman, Cowgill & Popham* and *John F. Cook* for respondent.

COLLET, J.—Respondent Amelia Lahtinen recovered a judgment against appellant Continental Building Company for $25,000 for personal injuries received by her because of the alleged fault of appellant. The principal question presented is the sufficiency of the evidence to support the verdict. The facts pertinent to the determination of that issue follow.

Appellant is the owner of what is known as the Kansas City Athletic Club building, a twenty-two story structure located at the northwest corner of Eleventh and Baltimore Avenue, Kansas City, Missouri. Immediately north of and immediately adjacent to the Kansas City Athletic Club building is a three-story building referred to as the Schier building owned by Phil Schier and Hugo Levy. On July 19, 1923, while the Kansas City Athletic Club building was still under construction appellant leased the entire third floor of that building, excepting elevator shafts, stairway and ventilating hatches to the Chamber of Commerce of Kansas City, Missouri, for a period of fifteen years from the date of its completion. By the terms of that lease appellant agreed, among other things, to repair and maintain the building and permanent fixtures; to provide a separate elevator and operator for the use of lessee, its members and those having need therefor; to provide a stairway from the leased premises to the ground floor entrances; and to furnish and maintain such fire equipment as is required by insurance underwriters or city ordinances of Kansas City, Missouri. The Chamber of Commerce took possession of the premises under this lease in 1923 and continued in possession until after respondent's injury. Prior to January 8, 1931, the Charities Bureau of the Chamber of Commerce was located on the mezzanine floor of the Kansas City Athletic Club building. On the latter date the Chamber of Commerce entered into a lease with Phillip Schier and Hugo Levy, owners of the Schier building, under the terms of which the Charities Bureau was to occupy the entire third floor of that building for a term of eight years. There was no passageway

between the third floor of the Schier building and the third floor of the Kansas City Athletic Club building. Each building had a separate wall. The latter lease provided that Schier and Levy should obtain permission from the proper parties to construct an opening through the wall of the Kansas City Athletic Club building and to construct at their expense a doorway through the two walls, the doorway to be fitted with ''a pair of 2/6 x 7' underwriter's label, metal covered doors on the Kansas City Athletic Club side of the wall and with a sliding fire door underwriter's label approved'' on the north side of the south wall of the Schier building. The floor level of the third floor of the Schier building was approximately five feet lower than the floor level of the third floor of the Kansas City Athletic Club building. The lease provided that Schier and Levy were to construct a stairway from the doorway down to the floor level of the third floor of the Schier building, and that ''the improvements on said land are/or will be constructed of good material in good workmanlike manner, and in conformity with the laws and ordinances affecting same; and said premises will be in good tenantable condition.'' In addition to this provision the latter lease further provided ''that the lessors will keep the roofs, down-spouts, sky-lights, gutters, outer walls, plumbing, heating plant, hall-ways, stairways, sidewalks and approaches belonging or in any way appertaining to the above described premises, in good and sufficient repair, and will make any such repairs as may be necessary.'' The doorway was constructed, the doors and stairway installed and thereafter on February 15, 1931, the Charities Bureau moved into the Schier building.

Although the Schier building was equipped with a stairway leading from the third to the ground floor of that building yet the new door was used almost, if not entirely exclusively, in going to and from the Charities Bureau. Employees and officials of other departments of the Chamber of Commerce passed through it in going from their offices in the Kansas City Athletic Club building to the Charities Bureau in the transaction of inter-departmental business. Likewise the personnel of the Charities Bureau passed through it in going from their quarters to other departments and to other floors of the Kansas City Athletic Club building or to the street. Visitors having business with the Charities Bureau ordinarily entered the lobby of the Kansas City Athletic Club building on the first floor, took the Chamber of Commerce elevator or one of the other elevators to the third floor, alighted on that floor which is in the possession and control of the Chamber of Commerce to the extent fixed by the terms of its lease heretofore referred to, inquired at the Chamber of Commerce information desk for the Charities Bureau and were directed through the door in question. As above indicated the doorway was five feet in width in which two doors were hung on the Kansas City

Athletic Club side of the wall, one being attached to the east side of the doorway, the other to the west side. The east door was usually fastened shut. The west door was opened by means of two handles, one on either side of the door and both attached to a steel bar extending through the door. The door was equipped with an automatic closing device. An estimate of one of the employees of the Charities Bureau fixed the number of persons passing through this door from the date of its installation until the date of respondent's injury at from fifty to one hundred per day.

On May 14, 1931, the respondent being desirous of soliciting the assistance of the Chamber of Commerce in securing employment, entered the Kansas City Athletic Club building through the Baltimore Avenue entrance, got on the Chamber of Commerce elevator and was taken to the third floor where she got off in the reception room. Finding no one at the information desk immediately in front of the elevator she inquired of a man at a nearby desk for someone who could advise her about securing employment. She was directed to go through the door to the Charities Bureau. Following this direction she opened the west door, passed through the doorway, and grasping the handle on the north side undertook to pull the door shut when the handle came off, precipitating her headlong down the stairs to the floor of the Charities Bureau, seriously injuring her. She brought this action against Phil Schier and appellant to recover for those injuries. The record shows that the judgment was entered against both defendants and that motions for new trial were filed by both but as far as this record discloses no appeal was requested or granted Schier, the Continental Building Company only appealing.

Appellant's connection with the participation in the construction of the doorway and the installation of the doors is evidenced by the following correspondence between E. W. Wysong, representing Schier and Levy; John P. Cooper representing appellant Continental Building Company; and E. E. Matchette, general secretary of and representing the Chamber of Commerce:

"Lathrop Building       Victor 2625

"E. W. WYSONG

"REAL ESTATE-LOANS-INVESTMENTS

"Specializing in Business Property

"KANSAS CITY, Mo.

"January 5, 1931

"Chamber of Commerce,
"Kansas City, Mo.
   Att'n. Mr. Matchette.
"Gentlemen:
  "My clients, Mr. Hugo Levy, and Mr. Phillip Schier, owners of the building adjoining the Kansas City Athletic Club Building on the

North, want a permit from the Continental Building Company to create an easement through the wall of the third floor of the Kansas City Athletic Club Building and through the wall of the third floor of the adjoining building, 1022 Baltimore Avenue, said easement to be made by cutting new doorway according to the blueprint attached hereto, said doorway to be equipped with a pair of 2 feet 6 inches x 7 feet Underwriter's Label Metal covered doors on the Kansas City Athletic Club side of the wall and with a sliding fire door, Underwriter's Label approved, on the side of the present room at 1022-24 Baltimore. This, of course, will be done in a workmanlike manner and the specifications in this paragraph have been approved of by the insurance underwriters. This easement is to be used by the Chamber of Commerce and its allied division and shall continue for a period of eight years, beginning February 1, 1931, and ending on the first day of February, 1939, this period being based upon the term of the lease between the Chamber of Commerce and Mr. Levy and Mr. Schier.

> "Yours very truly,
> "E. W. WYSONG."

> "THE CHAMBER OF COMMERCE
> of Kansas City
> "Kansas City, Missouri
> "Heart of America.
> > "January 5, 1931.

"Mr. John P. Cooper
"Kansas City Structural Steel Co.,
"Kansas City, Kansas.
"Dear Mr. Cooper:
"Re: Lease New Quarters for Charities Bureau.
"I enclose herewith communication from Mr. E. W. Wysong, Agent of the building owned by Messrs. Hugo Levy and Phillip Schier, which adjoins the Continental Building on the north. I am transmitting this in accordance with our phone talk on Friday last.

"The lease has been drawn and is now in the hands of our counsel for approval. The investigation made by your company with the underwriters confirms the statement to the effect that same has been approved and I would appreciate it if you would acknowledge receipt of the enclosed and advise that we may now proceed with the work of cutting a door-way, as shown on the blue-print, hereto attached,— the lease to expire concurrently with the lease of our present quarters.

> "Yours very truly,
> "E. E. Matchette,
> "ERIC E. MATCHETTE,
> > "General Secretary."

"THE CHAMBER OF COMMERCE
of Kansas City
"Kansas City, Missouri
"Heart of America
"January 12, 1931

"Messrs:
"Phillip Schier and Hugo Levy
"Owners of Building, 1022-24 Baltimore Avenue
"Kansas City, Missouri
"Gentlemen:

"The Chamber of Commerce has secured permission from the Continental Building Company for the opening between the two buildings as described and provided for in the blue prints accompanying the lease between C. W. Pfeiffer, guaranteed by the Chamber of Commerce, and the owners of the building above referred to,—such construction and maintenance to be in accordance with underwriters' requirements. This arrangement was made at a joint meeting between Mr. Cooper, representing the Continental Building Company, and the architects and engineers representing the owners of the properties to be connected by this opening. ,

"I have also discussed the matter with Mr. Howard Fitch and have transmitted to them copy of your communication addressed to this Chamber—blue print attached—and we have advice that it is satisfactory for you to proceed at once with the work.

"This communication in no way changes, alters or amends any portion of the executed lease between lessor and lessee as to the obligations contained therein, but simply conveys to you the authority secured from the owners of the building (3rd floor), occupied by the Chamber of Commerce known as the Continental Building Company.

"Yours very truly,
"E. E. MATCHETTE,
"ERIC E. MATCHETTE,
"General Secretary."

"COPY
"THE CONTINENTAL BUILDING COMPANY
owner and operator of
The New
"Kansas City Athletic Club
Kansas City, Missouri
"January 12, 1931

"Chamber of Commerce
"Kansas City, Missouri
"Attention: Mr. Eric E. Matchette, General Secretary.
"Gentlemen:

"Answering your letter of January 5, we consent to your having a

door cut through the north wall of the Kansas City Athletic Club Building as indicated on the blue print drawing accompanying your letter, provided the door complies with the underwriters requirements as to class and quality of material and is equipped with a standard automatic closing device, which we are informed will result in no change in the insurance rate of either building by virtue of the door opening. The privilege of opening and maintaining said doorway shall continue during the term of your present lease with the Continental Building Company or extensions thereof by mutual agreement.

"We do not consider this as the creation of an easement nor does it give any vested right to anyone, merely a privilege of convenience extended to you during your tenancy under lease.

"Yours very truly,

"(SIGNED)

"CONTINENTAL BUILDING COMPANY

"By John P. Cooper,

"Secretary and Treasurer."

"THE CHAMBER OF COMMERCE

of Kansas City

"Kansas City, Missouri

"Heart of America

"January 12, 1931

"Messrs. Phillip Schier and Hugo Levy

"Owners of Building—1022-24 Baltimore Avenue

"Kansas City, Missouri

"Gentlemen:

"I attach hereto copy of communication received this date from Mr. John P. Cooper, Secretary-Treasurer, Continental Building Company, confirming advices given you yesterday of consent to having door cut through north wall of the Kansas City Athletic Club Building as indicated on the blue print drawing which accompanied your letter and was transmitted to them, and outlining the conditions under which this privilege is granted.

"Yours very truly,

"E. E. MATCHETTE,

"ERIC E. MATCHETTE,

"General Secretary."

The record does not disclose who actually paid for the installation of the doors but it is clear that appellant did not. Appellant employed an engineer who made all necessary repairs to the Kansas City Athletic Club building. There is no evidence however that he inspected, adjusted or repaired the door in question either by request or voluntarily. Appellant received no compensation whatever for

granting permission to construct the doorway and install the doors, neither did it examine, or approve the doorway or doors.

Both defendants offered instructions in the nature of demurrers at the close of the plaintiff's case and again at the conclusion of the entire case. Both were overruled. As heretofore stated we are now concerned with the propriety of the action of the court in overruling the demurrer offered by appellant Continental Building Company.

The legal questions presented may be summarized as follows: Both parties apparently agree that a landlord is liable for injuries resulting from defects in that part of demised premises which may be classified as common passageways. Appellant insists the doorway was not a common passageway while respondent says it is. Second,—appellant asserts that it had no right to the control or possession of the leased premises and therefore was not liable in an action in tort by an invitee of the tenant for injuries resulting from the defective condition of the premises not created by appellant and which occurred during the possession of the tenant. In answer to this respondent says that appellant was obligated to keep the premises in good repair by the covenants of the lease and also by the city ordinance which required appellant to maintain fire doors in the doorway in question and that therefore appellant was liable in this action for the defective condition of the door handle. Third,—respondent asserts and appellant denies that the evidence is sufficient to take the case to the jury on the theory that appellant actually constructed and installed unsafe doors. These questions will be taken up in the order stated.

It is well established that a landlord will be liable to his tenant or the tenant's invitees for injuries resulting from defects in the premises existing in passageways or other parts of the premises, the exclusive possession of which has not passed to any one tenant and the control of the use of which has been reserved by the landlord. [Duff v. Eichler, 336 Mo. 1164, 82 S. W. (2d) 881; Gray v. Pearline, 328 Mo. 1192, 43 S. W. (2d) 802; Turner v. Ragan (Mo.), 229 S. W. 809; Bender v. Weber, 250 Mo. 551, 1. c. 563, 157 S. W. 570.] This is apparently based upon the landlord's responsibility for the condition of that part of the premises over which he has control. And where the exclusive possession rests in the tenant the landlord will be liable for injuries resulting from defects caused by his active negligence or misfeasance in the making of repairs either under a covenant to do so or voluntarily. [Grant v. Tomlinson, 138 Mo. App. 222, 119 S. W. 1079; Vollrath v. Stevens, 119 Mo. App. 5, 202 S. W. 283; Bloecher v. Duerbeck, 333 Mo. 359, 62 S. W. (2d) 553; Mahnken v. Gillespie, 329 Mo. 51, 1. c. 61, 43 S. W. (2d) 797; Shaw v. Butterworth, 327 Mo. 622, 38 S. W. (2d) 57.] But the evidence

before us does not support respondent's conclusion that the doorway was a common passageway. The evidence is undisputed that the Chamber of Commerce had the exclusive control and right to the possession of all the floor space on the third floor of the Kansas City Athletic Club building except possibly the small portion thereof necessary to the use of the stairway which was in no way connected with or adjacent to the door in question. The Chamber of Commerce also had the exclusive control and possession of the entire third floor of the Schier building. The doorway, and the doorway alone, separated the two rooms, there being no intervening passageways, hallways or other area not under the control of the one tenant. Although the doorway was used by a great many people other than employees of the tenant yet that did not make the doorway a public thoroughfare. Those persons were at most the invitees of the tenant, and on the premises for the purpose of transacting business with the tenant. Since the doorway was not a common passageway (Bender v. Weber, 250 Mo. 551, l. c. 564, 157 S. W. 570), the rule applicable to common passageways does not apply. The obligation to make repairs or the right to enter the premises therefor does not constitute the possession or control on the part of the landlord necessary to liability under this rule. [Cavalier v. Pope, L. R. App. Cas. 1906, 428; Cullings v. Goetz, 256 N. Y. 287, 176 N. E. 397.]

The authorities cited in support of the theory that the doorway was a common passageway all involve situations where the landlord was retaining the control of a part of the premises for the joint use of more than one party and hence do not apply here. Appellant was not liable on that ground.

■ Was appellant liable upon the theory that the terms of the lease between appellant and the Chamber of Commerce required appellant to keep all permanent fixtures, including the door and door handle in question, in good repair and, failing to do so became liable in tort for the injury resulting from its neglect? Assuming, but not determining, that appellant did agree to keep this door handle in good repair, appellant's failure to carry out that contractual obligation did not furnish a basis for liability in an action *ex delicto*. [Degnan v. Doty (Mo.), 246 S. W. 922; Kohnle v. Paxton, 268 Mo. 463, 188 S. W. 155; Peter Piper Tailoring Co. v. Dobbin, 195 Mo. App. l. c. 437, 192 S. W. 1044.] The violation of a contract will not, as such, furnish a basis for liability in tort, but the act which violates the contract may be a negligent one which creates such liability. In such a case it is the negligent act rather than the violation of the contract which furnishes the basis for the liability. As stated in Kohnle v. Paxton, supra, l. c. 479:

"A breach of the contract to repair resulting in injuries to the

tenant may arise from the negligence of the landlord, but this is not such technical negligence as will authorize a right of action in tort; this can only exist independent of the contract for injuries not proximately resulting from the breach and therefore not within the contemplation of the parties. Put more plainly, an agreement to repair does not contemplate a destruction of life or an injury to the person which may result accidentally from an omission to fulfill the terms of the agreement. [Hamilton v. Feary, 8 Ind. App. 615, 52 Am. St. 485; affirmed 140 Ind. 45; Arnold v. Clark, 13 Jones & Spen. 1. c. 257; Miller v. Rinaldo, 47 N. Y. Supp. 636.]

"In the instant cases it not only appears from the pleadings that the landlord covenanted to repair and keep the premises in a tenant-able condition, but that the defect was or could have been known to the landlord and was not known to the tenant. While there is a line of authorities requiring the tenant to be notified of latent defects, and upon a failure so to do holding the landlord liable for injuries arising therefrom, the nature of the defect, in this case a worn floor, was as easily discoverable by the tenant as the landlord, and since the pleadings charge presumption of knowledge from the landlord's ownership rather than actual knowledge, in the absence of fraud or deceit this will not serve to fix a liability in tort. Ownership does not create a presumption of a knowledge of the particular condition of premises; and a defect alleged to be latent, if easily discoverable to both parties, is not a ground of liability. [Doyle v. Railroad, 147 U. S. 413; Anderson v. Robinson, 182 Ala. 615; Jackson v. Odell, 9 Daly (N. Y.) 371; Davidson v. Fischer, 11 Colo. 583.]

"In the cases at bar the petitions sound in tort, but they do not disclose such active negligence independent of the contract as will support an action of this character. In view, therefore, of the strong trend of authority limiting the right of action in such cases to suits for a breach of the contract, we feel impelled to hold that the plain-tiffs have mistaken their remedy. That much may be and has been said to the contrary, especially in the well reasoned cases of Willcox v. Hines and Graff v. Brewing Co., supra, we do not hesitate to admit; but considering the nature of the actions, the relationship of the parties, as landlord and tenant, and the general law in regard to the force and effect of contracts, the doctrine declared in these cases is not approved."

Nor is appellant liable upon the theory that the city ordinance placed upon it the duty to maintain the fire door in good repair. The ordinance is as follows:

"Protection of Wall Openings. Section 20-1. Protection Exterior Wall Openings.

"1. Every building within the fire limits over three stories in

height occupied for manufacturing, mercantile or warehouse purposes and all buildings over four stories in height occupied for office, hotel, hospital or asylum purposes, also buildings over five stories in height occupied for apartment or tenement house purposes, shall have approved fire doors or fire windows on every exterior opening above the first story, when fronting on a street or public driveway less than 40 feet wide, or where another building is within 40 feet of such opening.''

Respondent cites two cases, Zeibig v. Pfeiffer Chemical Co., 150 Mo. App. 482, 131 S. W. 131, and Yall v. Snow, 201 Mo. 511, 100 S. W. 1, 10 L. R. A. (N. S.) 177, 119 Am. St. Rep. 781, which on first impression would seem to support her position. On analysis they do not. Zeibig v. Pfeiffer, supra, was an action by a landlord against his tenant for the cost of installing a fire escape required to be constructed by a statute during the occupancy of the tenant. The Court of Appeals recognizes the general proposition that in the absence of a contract the tenant is liable for repairs during his tenancy, but referring to the statute making it the ''duty of the owner, proprietor, lessee or keeper . . . to provide . . . fire escapes . . .'' observes that ''in so far as the general public is concerned, the law lays an obligation against both the owner and lessee to construct fire escapes.'' The opinion then proceeds to point out that as between the owner and the tenant the obligation rests primarily on the owner, such a repair (if it may be called a repair) ''not being within the range of ordinary repairs which a tenant, in the absence of an agreement to the contrary, is required to make.'' The court then construed the lease agreement and finding no covenant therein which required the tenant to construct the fire escape, held that the landlord could not recover the cost of its construction. It thus appears that in stating there was a joint responsibility on the part of the landlord and tenant, the court must have had in mind the general rule of joint responsibility of the landlord and tenant to the general public referred to in Bender v. Weber, supra, l. c. 565, and analyzed in Walsh v. Southwestern Bell Telephone Co., 331 Mo. 118, 52 S. W. (2d) 839. That is not the situation before us. Here we are dealing with the landlord-owner's liability to the invitees of the tenant, an entirely different matter.

The case of Yall v. Snow, supra, was an action by a widow for the death of her husband, Morris Yall, a guest at a hotel. The hotel burned. Yall was unable to escape because there were no fire escapes. The building was of the character which the statute required to be equipped with fire escapes. The action was based on the duty imposed on the owner by the statute and his failure to perform that duty. The court held that the statute placed the duty on the owner as well

as the lessee to provide fire escapes and that the owner could not escape liability merely because the command of the statute was directed to the "lessee" or "keeper" of the premises as well as to the owner. As stated above .the action was based on the violation of the duty imposed by statute. In the case at bar the ordinance did not place the individual or personal responsibility of installing the fire door upon the owner. There is no dispute that the door in question was of a proper design and properly constructed *as a fire door*. Therefore, the requirement of the ordinance was complied with. That the act of compliance was not committed by the owner of the building does not alter that fact. If the door was not of a proper design or was improperly constructed for the particular purposes to which the tenant put it or if it was not properly maintained, responsibility therefor must be determined by the general rules of law and not by this ordinance which makes no requirement that approved fire doors shall be suitable for use as service doors and which does not undertake to fix responsibility for maintenance. As pointed out above, even if the owner was required by the terms of the lease to maintain the door, the failure to perform that contractual obligation would not create any liability in an action *ex delicto* by the invitee of a tenant in possession.

Respondent contends that the following evidence was sufficient to justify submitting to the jury the question of whether appellant made and installed the doorway:

"Redirect examination of respondent's witness E. E. Matchette, General Secretary of the Chamber of Commerce:

"Q. Do you know of your own knowledge whose money paid for that installation? A. Well, that would be pretty difficult to say. It wasn't the Continental Building Company nor the Chamber of Commerce.

"Q. The Chamber of Commerce didn't pay anything for it? A. No.

"Q. And it was put in under some consent or arrangement between the two owners of the buildings? . . . A. As per this letter of January 12th?"

The letter referred to is set out above. That part of it relied upon by respondent is:

"This arrangement was made at a joint meeting between Mr. Cooper, representing the Continental Building Company, and the architects and engineers representing the owners of the properties to be connected by this opening. . . ."

We fail to see how this evidence could furnish any foundation for the conclusion that appellant made and installed the doors.

In determining the sufficiency of the evidence to sustain the

verdict the evidence should be viewed in its most favorable light to respondent, but if, after doing that, there is no theory upon which the verdict can be sustained the judgment should be reversed. That is the situation here.

The judgment as to the appellant Continental Building Company is reversed.

PER CURIAM:—The foregoing opinion by COLLET, J., in Division One is adopted as the opinion of the Court en Banc. All concur.